MAXWELL, J.,
for the Court:
¶ 1. Albert Donelson, Eric Lindsey, and Antonio Marshall beat Richard Crosby, stripped him naked, stuffed him in a grocery cart, and dumped him in a parking lot — all because Donelson did not recognize Crosby as he walked past Donelson’s house late one night.
¶ 2. On appeal of his aggravated-assault conviction, Donelson claims the uncorroborated testimony of his accomplice Marshall was insufficient to support a guilty verdict. But Marshall’s testimony that Donelson kicked and bludgeoned Crosby with an assault rifle was indeed corroborated — by the trail of blood leading to Donelson’s door, by Crosby’s blood found on Donelson’s legs, by Crosby’s bloodstained clothes found inside Donelson’s house, and by the bloodied shopping cart found beside Donelson’s house. There was also a second witness who placed Donelson in the middle of the altercation, which she testified Donelson started. Thus, we find the evidence was sufficient to support the jury’s guilty verdict.
¶ 3. We also disagree that Donelson is entitled to a new trial. Donelson, who was known around Jackson, Mississippi, as “Batman,” sought to prevent jurors from learning his alias. So he filed a motion in limine asking that he not be referred to as “Batman” during trial, which the judge granted. This ruling was accidentally violated once. And on appeal, Donelson complains that once was enough for a mistrial. But during the trial Donelson did not seek a mistrial. Nor did he even raise this issue in his motion for a new trial. And we find no plain error when the judge— after swiftly correcting the State and ensuring no other mention of the name “Batman” was made — continued with the trial.
¶ 4. Because we also find, despite Do-nelson’s remaining assertions, that no other reversible error occurred, we affirm.
*1157 Background

I. Attack on Crosby

¶ 5. For several weeks, Crosby and his brother, Richard Barnes, had been staying off and on at their father’s house on Huron Street in Jackson, Mississippi. In the wee hours one morning, they found themselves hungry. So they walked to a pool hall around the corner that served food.
¶ 6. While it was still dark, they started to walk back home. They rounded the corner of Palmyra and Huron Street, where Donelson’s purple house sat. Do-nelson was on his porch with Lindsey, Marshall, and several others. Donelson yelled at the two men, asking who they were and why they were walking past his house. Crosby replied that Donelson knew him because he stayed down the street. Unsatisfied with Crosby’s answer, Donelson and several others left the porch to confront Crosby and Barnes.
¶ 7. Barnes testified that he saw a gun and took off running. He escaped. His brother was not as lucky. Barnes saw some of the men grab his brother. But, due to the darkness, he could not identify which ones. Barnes could, however, hear them whaling on Crosby. He also heard a gunshot, so he kept running.
¶ 8. Crosby testified that he has no recollection of that night — or any other time during the month following the attack. Crosby told the jury he is still impaired from what happened that morning.
¶ 9. At 5:15 a.m., Jackson police responded to a call about a fight on Huron Street. Upon arrival, they found a giant pool of blood, a torn t-shirt, a bloody shoe, and a belt. They followed the blood trail to Donelson’s house. When they knocked on the door, Donelson answered. The officers observed Donelson’s bare legs had blood on them. Tests later confirmed the blood belonged to Crosby. The officers got a search warrant. They found Crosby’s bloodied shorts in Donelson’s bedroom. Behind the house, they found a red shopping cart with Crosby’s blood on it.
¶ 10. Officers also found Crosby— naked and unconscious — in a nearby parking lot. His eyes were swollen shut, and he had a severe head wound.
¶ 11. After initially detaining six people, the officers’ investigation narrowed down to three suspects — Donelson, Lindsey, and Marshall. All three were indicted for armed robbery and aggravated assault.
¶ 12. Marshall pled guilty to the assault charge and agreed to testify at Donelson and Lindsey’s trial. Marshall told the jury that Donelson, along with Lindsey, kicked Crosby. Donelson then clubbed Crosby with an assault rifle he was holding. When the beating stopped, Donelson ordered Lindsey and Marshall to strip Crosby, stuff him in the grocery cart, and get him out of there.
¶ 13. Lindsey and Donelson chose not to testify in their defense. The only other eyewitness besides Crosby’s brother and Marshall was Nina Myers. Myers was on the porch that night when Crosby walked by. Myers confirmed Donelson was there — along with a rifle leaning against the railing. She also confirmed that Do-nelson was angry about Crosby walking by and had left the porch with Lindsey and another unidentified guy to confront him. Myers initially testified she had seen Do-nelson kick Crosby. But she later testified only Lindsey had beaten him. When Lindsey started pushing and kicking Crosby, Myers claimed she shot a gun into the air. That is when Donelson turned around and told her to go home. She claimed she immediately complied, leaving while Crosby was still standing and clothed.

II. Verdict, Post-trial Motions, and Appeal

¶ 14. The jury was instructed on what was necessary to find either Donelson or *1158 Lindsey guilty of armed robbery, aggravated assault, and simple assault. The jury found neither one guilty of armed robbery. But they found Lindsey guilty of simple assault, and Donelson guilty of aggravated assault. Donelson was sentenced to twenty years in the custody of the Mississippi Department of Corrections.
¶ 15. Within ten days of the judgment, Donelson filed a motion for a judgment of acquittal notwithstanding the verdict or a new trial. Three months after this post-trial motion was denied, Donelson sought additional time to file an appeal, claiming he had just learned that his post-trial motion had been ruled on. See M.R.A.P. 4(h) (authorizing trial judge to reopen the time to file an appeal if he finds certain conditions were met — which include a party not receiving notice that a dispositive order had been entered). While that motion for more time was pending, Donelson filed a document entitled “Second Motion for New Trial, or in the Alternative, Post-Conviction Relief.” On the same day, the trial court denied this “second motion for new trial” but granted Donelson an additional two weeks to file a notice of appeal, which he promptly did.[1]
Discussion

I. Sufficiency and Weight of the Evidence

¶ 16. Donelson contends he was entitled to a directed verdict or at least a new trial based on the evidence — or rather lack thereof. But viewing the evidence in the light most favorable to the State, as we must, we find it is neither insufficient nor substantially outweighed by evidence supporting acquittal.

A. Sufficiency of the Evidence

¶ 17. At the end of the State’s presentation, Donelson moved for a directed verdict, which was denied. And after the judgment of conviction was entered, Do-nelson moved for a judgment of acquittal notwithstanding the jury’s verdict, which was also denied.
¶ 18. Both motions challenged the sufficiency of the evidence. Smith v. State, 889 So.2d 489, 495 (¶ 11) (Miss.2003). When considering the sufficiency of the evidence, we view all the evidence in the light most favorable to the State. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). This means we “give the State the benefit of all favorable inferences reasonably drawn from the evidence.” Grossley v. State, 127 So.3d 1143, 1147 (¶ 10) (Miss.Ct.App.2013) (citing Jones v. State, 20 So.3d 57, 64 (¶ 16) (Miss.Ct.App.2009)). Viewing the evidence in this manner, we ask whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush, 895 So.2d at 843 (¶ 16) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

1. Aggravated Assault

¶ 19. The essential elements of the crime Donelson was charged with and convicted of were: (a) that Donelson knowingly caused or attempted to cause, (b) bodily injury to Crosby, (c) with a deadly weapon — namely an assault rifle, handgun, and/or blunt object used as means likely to produce death or serious bodily injury. See Miss.Code Ann. § 97 — 3—7(2)(a)(ii) (Supp.2013) (“A person is guilty of aggravated assault if he ... attempts to cause *1159 or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]”).
¶20. Donelson argues there was no evidence that he used a rifle, gun, or blunt object to injure Crosby. Under his assessment, the evidence at best supports him kicking Donelson. And as his foot is not a “blunt object,” he reasons there is no evidence he injured Crosby with a deadly weapon.[2]
¶ 21. But unlike Donelson, we must view the evidence in the light most favorable to the State. And in doing so, we find there was evidence Donelson injured Crosby by striking him with an assault rifle. Although no rifle was recovered, Myers testified she saw a rifle on the porch that night and in the hands of Lindsey as he and Donelson accosted Crosby. Barnes testified he took off running because he saw guns. Marshall testified that, at some point during the beating, Donelson “had an assault rifle in his hand” and hit Crosby with it. And the police officer who found Crosby naked and unconscious testified Crosby had a severe head wound.
¶ 22. Our supreme court has held that a gun does not have to be “used for its designed purpose” in order for it to be a deadly weapon. Jenkins v. State, 913 So.2d 1044, 1049 (¶ 16) (Miss.Ct.App.2005) (citing Griffin v. State, 540 So.2d 17, 19 (Miss.1989)). A gun can also be a deadly weapon when “used as a bludgeoning instrument.” Id. And “[i]t is within the province of the jury to determine whether or not such use makes the [gun] a deadly weapon” for purposes of section 97-3-7(2)(a)(ii). Jenkins, 913 So.2d at 1049 (¶ 16). The jury heard evidence that, after Donelson and others “stomped” Crosby, while Crosby was still on the ground, Do-nelson struck him with an assault rifle. The jury saw pictures of the battered Crosby taken while he was in the hospital and heard testimony by Crosby that, due to his injuries, he had no recollection of that night. Thus, we find the evidence sufficient for a rational trier of fact to find that the elements of section 97—3—7(a)(ii) had been met.

2. Accomplice Testimony

¶ 23. Donelson also insists he was entitled to a directed verdict because the evidence consisted of the uncorroborated testimony of his co-indictee Marshall.
? “Generally, uncorroborated accomplice testimony may be sufficient to convict a defendant.” Grossley, 127 So.3d at 1148 (¶ 14) (citing Osborne v. State, 54 So.3d 841, 846 (¶ 22) (Miss.2011)). But “this general premise ‘is inapplicable in those cases where the testimony is unreasonable, self-contradictory or substantially impeached.’” Id. (quoting Osborne, 54 So.3d at 846 (¶ 22)). Donelson claims Marshall’s testimony falls under the exception to the general rule, based on multiple con *1160 flicting statements Marshall gave to the authorities before he decided to plead guilty and testify against Donelson and Lindsey.
¶ 25. But this claim rests on the assumption that Marshall’s testimony was uncorroborated. “The Mississippi Supreme Court has been clear ... that ‘only slight corroboration of an accomplice’s testimony is required to sustain a conviction.’ ” Id. (quoting Osborne, 54 So.3d at 847 (¶ 22)). And “[t]he particular testimony needing corroboration is the portion tying the defendant to the crime.” Id. In Osborne, the defendant made a similar claim about uncorroborated accomplice testimony. Osborne, 54 So.3d at 846 (¶22). The supreme court found that, while the accomplice “had provided inconsistent accounts of the events, he explained his actions at trial.” Id. at 847 (¶ 23). The supreme court also found the accomplice’s “testimony was reasonable and not substantially impeached.” Id. Most important, the supreme court found the accomplice’s testimony “was corroborated” by another witness who also connected the defendant to the crime. Id.
¶ 26. Here, Marshall explained his previous inconsistent statements — he was trying to shield himself as well as Donel-son and Lindsey from the pending charges. While Donelson vigorously argues that Marshall’s testimony was not only unreasonable but also impeached by Myers’s testimony, we fail to see the “irreconcilable conflict” between their testimonies. Myers testified that Donelson was the one who sparked the conflict and was part of the group that left the porch to confront Crosby. She also remembered seeing a rifle. But she left just as things were starting to escalate, before the attack was over.
¶ 27. As in Osborne, Marshall’s testimony about the brutal and humiliating assault that followed was corroborated, not just by Myers but by other evidence. Once alerted about the attack, police officers literally followed the trail from the pool of Crosby’s blood in the middle of Huron Street to Donelson’s doorstep. And then when Do-nelson opened the door, they saw more blood on Donelson’s legs. Further, Crosby’s bloodied clothes were found in Donel-son’s bedroom, and the shopping cart used to dispose of the naked and unconscious Crosby was found behind Donelson’s house, corroborating Marshall’s account of what happened after Donelson bludgeoned Crosby.
¶ 28. Taken as a whole, we find the evidence sufficient to support the jury’s guilty verdict.

B. Weight of the Evidence

¶ 29. Donelson makes the alternate claim that he is entitled to a new trial because his conviction goes against the overwhelming weight of the evidence. This claim is based on the same reason he challenges the sufficiency of the evidence — his skepticism towards Marshall’s accomplice testimony.
¶ 30. “A motion for a new trial challenges the weight of the evidence.” Grossley, 127 So.3d at 1149 (¶ 19) (citing Bush, 895 So.2d at 844 (¶ 18)). “The power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id. (quoting Bush, 895 So.2d at 844 (¶ 18)). “When considering an objection to the weight of the evidence, we view the evidence in the light most favorable to the verdict and ‘will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.’ ” Id. (quoting Bush, 895 So.2d at 844 (¶ 18)).
¶ 31. In asking that we reverse and grant him a new trial, Donelson essentially requests that we declare Mar *1161 shall’s testimony not credible. But it is the jury, not this court, that “must weigh witness testimony and determine its credibility.” Osborne, 54 So.3d at 846 (¶ 21) (citing Massey v. State, 992 So.2d 1161, 1163 (¶ 12) (Miss.2008)). Like the supreme court, we “will not pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.” Id. (internal quotation omitted). After hearing Marshall testify, “the jury was in the best position to determine the weight and credibility of [his] testimony.” Id.
¶ 32. What is more, like in Osborne, the jury was given a cautionary instruction about Marshall’s testimony. See id. at 846-47 (¶¶ 22-23). We must presume the jury followed the instruction[3] to weigh Marshall’s testimony “with great care, caution and ... suspicion,” and, having done so, found it credibly supported finding Do-nelson guilty.
¶ 33. Thus, we find the verdict was not against the overwhelming weight of the evidence.
II. “Batman ” Reference
¶34. Instead of being based on the evidence, Donelson claims the verdict was based on jury bias — bias triggered when the prosecutor read from a witness statement that referred to Donelson as “Batman.”
¶ 35. The moniker had been banned during voir dire, upon request of Donel-son’s counsel. The trial judge acknowledged Donelson’s nickname was probative in determining if any potential jurors had previous knowledge of Donelson or this particular case. But she also determined any probative value was outweighed by the potential prejudice if the jury realized Do-nelson was “Batman,” due to the negative media portrayal of a supposed Jackson criminal named “Batman.” See M.R.E. 403 (giving the trial judge discretion to exclude relevant evidence “if its probative value is substantially outweighed by the danger of unfair prejudice”).
¶ 36. The trial judge appended her ruling with a strong warning. She told the State, ‘You’re going to have to advise your witnesses. If they come out with that, you’re going to be looking at a reversible case.” She continued by saying that Do-nelson was going to be given a fair day in court, so if he was to be convicted, it was going to be based on the evidence, not his nickname.
¶ 37. No mention was made of “Batman” during voir dire, opening statements, or examination of the first three witnesses. But as the officer who took Marshall’s initial statement was testifying, the prosecutor asked, “Did Mr. Marshall tell you, T saw Batman’ — I’m sorry. ‘Albert Donel-son and E-Rock out on the street beating and hitting[.]’ ” The judge immediately interrupted the prosecutor, telling him the objection was being sustained. When the prosecutor asked what objection, the judge said that no objection was necessary. The State continued examining the officer, without any complaint from Donelson. And no other reference was made to “Batman” for the remainder of the trial.
¶ 38. Instead, Donelson asserts for the first time on appeal that the judge plainly erred by not sua sponte declaring a mistrial as soon as the word “Batman” was uttered. But plain error is reserved for “ ‘unusual circumstances,’ as a means of preventing a manifest miscarriage of justice.” Goff v. State, 14 So.3d 625, 655 (¶ 118) (Miss.2009) (quoting Dixon v. State, 953 So.2d 1108, 1116 (¶22) (Miss.2007)); see also Mills v. State, 763 So.2d *1162 924, 929 (¶ 17) (Miss.Ct.App.2000) (“A violation of a motion in limine should not result in the costly and time-consuming penalty of a new trial unless it affirmatively appears from the whole record that a miscarriage of justice has resulted.”). And we find nothing usual or manifestly unjust in how the trial judge responded to the State’s single reference to “Batman.”
¶ 39. “To constitute plain error, the trial court must have deviated from a legal rule, the error must be plain, clear or obvious, and the error must have prejudiced the outcome of the trial.” Keithley v. State, 111 So.3d 1202, 1204 (¶ 8) (Miss.2013) (emphasis added). The State’s reference to “Batman” — while isolated and seemingly uncalculated — was improper. But it is the court’s reaction that we must evaluate for plain error. And here, the trial judge reacted swiftly to enforce her prior evidentiary ruling. Further, she was careful not to use the word “Batman” again or otherwise draw attention to the alias.
¶ 40. True, she did not declare a mistrial. But this was not because she failed to grasp the potential prejudice created by identifying Donelson as “Batman.” As the record shows, the judge was well aware of what might happen if the jury realized Donelson was “Batman” — which is why she not only granted Donelson’s motion in limine but also added the strong warning of the potential consequences of calling Donelson “Batman.” But possible consequences are not the same as actual consequences. Most telling about the reference to the off-limits alias is the fact that when the word “Batman” was uttered, the judge did not find a mistrial was necessary. See Mills, 763 So.2d at 928-29 (¶¶ 17-18) (finding that the trial judge was “in the best position” to determine that an unintentional violation of the motion in limine had not sufficiently registered with the jury to cause prejudice)'. And neither did Donel-son. Not only did he not ask for a mistrial, but even after conviction he did not deem the “Batman” reference material enough to cite as one of the multiple reasons he felt he should get a new trial.
¶ 41. Only in his supplemental brief .does Donelson argue the trial judge had no other option than to respond to the “Batman” reference by immediately declaring a mistrial. He essentially claims that, because the trial judge made a discretionary evidentiary ruling to exclude any reference to Batman because of its potential to be highly prejudicial, the judge had no discretion once that ruling was violated. In other words, because the trial judge predicted possible prejudice, she was bound to find her prediction came to fruition with the lone reference.
¶ 42. We disagree. Just as the trial judge had discretion to grant Donelson’s motion in limine,[4] she certainly had discretion to continue with the trial after her sustained objection to the State’s reference to “Batman” — particularly when Donelson himself did not move for a mistrial. See Mills, 763 So.2d at 928-29 (¶ 17) (“[T]he trial judge is in the best position to determine whether an objectionable remark has had any prejudicial effect[,] and for that reason the trial court is allowed considerable discretion in determining whether a remark was so prejudicial as to warrant a mistrial.”); see also Brent v. State, 632 So.2d 936, 941 (Miss.1994) (“The decision to declare a mistrial is within the sound discretion of the trial judge.”). After review, we find no plain error on this issue.

III. “Reasonable Doubt” Definition

¶ 43. Donelson also did not object when the judge explained the State’s burden of proof to potential jurors during voir dire. As with the “Batman” reference, he com *1163 plains for the first time on appeal that he is entitled to a new trial because, during her explanation, the judge improperly defined “reasonable doubt” for the jury.
¶ 44. For more than eighty years, the Mississippi Supreme Court has stood by its proposition that “[reasonable doubt defines itself; it therefore needs no definition by the court.” Barnes v. State, 532 So.2d 1231, 1235 (Miss.1988) (quoting Boutwell v. State, 165 Miss. 16, 30, 143 So. 479, 483 (1932)). But in Carr v. State — a case in which the judge acquiesced to the jury’s request that he re-explain “reasonable doubt” to them during deliberation — this court held that, because the defendant did not object, he was procedurally barred from challenging the judge’s explanation on appeal. Carr v. State, 966 So.2d 197, 203 (¶¶ 14-16) (Miss.Ct.App.2007).
1145. Donelson claims he is not procedurally barred but instead is allowed to proceed on plain error because, in this case, the judge defined “reasonable doubt” wrongly. Donelson characterizes the judge’s explanation as “virtually equating the criminal standard of reasonable doubt with the civil standard • of more probable than not.” But it is apparent from the transcript that the whole point of the judge’s explanation was to highlight the higher burden of proof for criminal convictions.
¶46. After describing the burden of proof in civil cases — nine of twelve' jurors finding liability based on a preponderance of the evidence — the judge told the jury that, “in a criminal case, someone’s liberty is at stake, their ability to be a free individual is at stake, so the burden of proof is beyond a reasonable doubt[.]” She continued to tell the jury that, while “beyond a reasonable doubt” does not have an exact definition, it is “a little bit heavier” than the standard in a civil case. “And it’s heavier because, again, a person’s liberty is at stake.”
¶ 47. Donelson seizes on the phrase “a little bit heavier” to argue the judge conflated the criminal standard of “beyond a reasonable doubt” with the civil standard of “more likely than not.” But it appears the judge’s explanation was that criminal judgments carry a higher burden, while leaving the exact definition of reasonable doubt to the jury.
¶ 48. Also, the judge’s statements were made during voir dire, before the jury was actually seated. And they were made solely to ensure the potential jurors understood what it meant to serve on a criminal jury. They were not made immediately before or, as in Carr, during deliberations. See id. at (¶ 15). Instead, at the end of trial, the seated jury received instructions. And Donelson admits there was nothing wrong with how these instructions spelled out the State’s burden of proof. So this is not a case where an erroneous instruction conflicts with a proper instruction. See Barnyard v. State, 47 So.3d 676, 684 (¶ 23) (Miss.2010). Nor did the jury instructions improperly define “reasonable doubt” for the jury. Rather, the instructions properly conveyed the necessary burden of proof to find Donelson guilty of aggravated assault. We thus find no plain error on this issue.

IV. Cross-Examination of Marshall

¶ 49. Donelson next suggests the judge “hindered [his] right to cross-examination” of' Marshall. But this point of error was waived because Donelson did not proffer the testimony he now claims the judge erroneously excluded.
¶ 50. On appeal, Donelson charges the judge violated his “sacrosanct” right to confront a witness against him and challenge the witness’s credibility and motive for testifying. As support, Donelson cites Davis v. State, 970 So.2d 164, 167 (¶ 7) (Miss.Ct.App.2006). In Davis, this court *1164 affirmed a defendant’s right to conduct a “[w]ide-open cross-examination of any matter bearing upon the credibility of the witness” — including “interrogation about the witness’s belief or perception as to whether the State could extend leniency for pending charges.” Id. And this court found reversible error because that right had been violated. Id. at 168-69 (¶¶ 8-13).
¶ 51. But there is a key difference between Davis and this case. In Davis, following the judge’s evidentiary ruling, Davis’s counsel made an offer of proof. Id. at 168 (¶ 10). On direct examination, the State had been allowed to ask the witness about a pending charge, suggesting the witness was receiving no leniency whatsoever in exchange for testifying. Id. at (¶ 8). But on cross, Davis’s counsel was prohibited from asking the witness if he believed the State had the power to be lenient in light of his cooperation. Id. at (¶ 9). Realizing the judge had likely made the wrong evidentiary call, Davis’s counsel made an offer of proof. Id. at (¶ 10). And “[t]he proffer show[ed] that not only did [the witness] believe that the prosecutor’s office had the power to offer him leniency, but in fact his lawyer was working on it.” Id. at 169 (¶ 11) (emphasis added). Because the proffer established that Davis had “permissible evidence of bias and interest, which Davis was entitled to show,” this court found the exclusion was reversible error. Id.
¶ 52. But in this case Donelson made no offer of proof. .During cross-examination, Donelson’s counsel first asked about Marshall’s plea deal in connection to the assault of Crosby. Then counsel asked about “another pending indictment for aggravated assault ... here in Hinds County.” The State objected, and the judge sustained the objection, instructing the jury to disregard counsel’s question. Unlike Davis, Donelson’s counsel made no effort to proffer evidence that Marshall had an additional charge pending against him and that he had sbme expectation of leniency based on his testimony. Instead of making a record, Donelson’s counsel chose to plow on — attacking Marshall’s motive for testifying from a different angle.
¶ 53. “When a trial court rules so as to prevent certain testimony from being introduced, it is incumbent on the party to make a proffer of what the witness would have testified to or the point is waived for appellate review.” Turner v. State, 732 So.2d 937, 951 (¶55) (Miss.1999) (citing Evans v. State, 725 So.2d 613, 669 (¶¶ 238-39) (Miss.1997)). And here Donelson made no proffer, so this issue has not been preserved for our review.

V. Jury Instructions

¶ 54. Because the issue of Marshall’s credibility had come up during trial, Donelson claims the judge’s rejection of his witness-credibility instruction was error. While Donelson had a right to instruct the jury on his defense theory — that the State’s witness was not credible — this right was not absolute. The trial judge was permitted to “refuse an instruction which incorrectly state[d] the law, [was] covered fairly elsewhere in the instructions, or [was] without foundation in the evidence.” Smith v. State, 90 So.3d 122, 133 (¶ 40) (Miss.Ct.App.2012) (quoting Harris v. State, 861 So.2d 1003, 1012-13 (¶ 18) (Miss.2003)).
¶ 55. The judge refused Donelson’s proposed instruction for two reasons. First, the judge found the way Donelson’s proposed instruction was worded would be confusing to jury.[5] Second, and more im *1165 portant, the issue of Marshall’s credibility was well covered in the other instructions. See id. Instruction 2 instructed the jury generally about weighing witness credibility — that, as the “sole judges” of witness credibility, the jury “should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief.” The instruction also told the jury to consider “[ijnconsistencies and discrepancies in the testimony of a witness” and whether such discrepancies should cause the jury “to discredit such testimony.” Instruction 9 instructed the jury specifically about weighing Marshall’s testimony. Submitted by Donelson and accepted by the judge without any objection, this instruction advised the jury that “Antonio Marshall was a co-defendant in this case and the testimony of a co-defendant is to be considered and weighed with great care, caution and ... suspicion.” (Emphasis added).
¶ 56. Our supreme court has emphasized, “A trial judge is under no obligation to grant redundant instructions.” Ellis v. State, 790 So.2d 813, 815 (¶ 5) (Miss.2001) (citation omitted), overruled on other grounds by Williams v. State, 32 So.3d 486, 491 (¶ 17) (Miss.2010). And “[t]he refusal to grant an instruction which is similar to one already given does not constitute reversible error.” Id.
¶ 57. Donelson cites Ellis to argue his proposed instruction was not redundant or covered elsewhere. But we fail to see how Ellis mandates reversal. The rule applied in Ellis was that a defendant is entitled to a cautionary instruction regarding accomplice testimony “where the testimony is ‘unreasonable, self contradictory or substantially impeached.’ ” ' Id. at 816 (¶ 8) (quoting Ballenger v. State, 667 So.2d 1242, 1253 (Miss.1995)).[6] Here, Donelson requested and was given instruction 9, a cautionary instruction focusing on Marshall’s testimony. So the judge was within her discretion to refuse the additional instruction proposed by Donelson.

VI. “Second Motion for New Trial”

¶ 58. Finally, Donelson appeals the denial of his “Second Motion for New Trial, or in the Alternative, Post-Conviction Relief’ — which he filed four months after his judgment was entered, three months after his first post-trial motion was denied, and a month and a half after he petitioned to reopen the time to file an appeal.
, ¶ 59. Donelson focuses on the merits of this motion. But we cannot overlook its *1166 procedural deficiencies. As a Rule 10.05 motion for a new trial, Donelson’s second motion was filed too late. URCCC 10.05 (“A motion for a new trial must be made within ten days of the entry of judgment.”). Yet as a motion for post-conviction relief (PCR), Donelson’s motion was filed too soon. See Rankin v. State, 636 So.2d 652, 655 (Miss.1994) (finding the petitioner’s PCR motion “was prematurely filed ... as his direct appeal had not yet been disposed of’). So for either reason, the trial judge was right to dismiss this motion as improper.
¶ 60. We too dismiss the claim raised in this motion. But we do so without prejudice. Donelson is free to raise this claim in a properly filed PCR motion. See Miss. Code Ann. § 99-39-7 (Supp.2013).
¶ 61. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ„ CONCUR.

. Donelson has appealed in forma pauperis. At first, his appeal was assigned to the Office of State Public Defender, Indigent Appeals Division, which submitted a brief on his behalf. Donelson's trial counsel then sought leave to replace the Indigent Appeals Division. Counsel was granted permission to file a supplemental brief. This opinion addresses the assertions of errors raised in both the original and supplemental briefs.

. Under section 97-3-7(2)(a)(ii), one does not need a deadly weapon—or any other object in his hands—to commit aggravated assault. A person is guilty of aggravated assault if he attempts to cause or purposefully causes bodily injury with a deadly weapon or any means likely to produce death or serious bodily injury. Id. Thus, one can commit aggravated with his bare hands—or in this case his shod feet—if he used his appendages in a way likely to produce death or serious bodily injury. See Sellers v. State, 108 So.3d 456, 459 (¶¶ 7-8) (Miss.Ct.App.2012) (citing Jackson v. State, 594 So.2d 20, 24 (Miss.1992)) (holding that the evidence presented a jury question whether the defendant committed aggravated assault by using his arm to choke his neighbor). Here, there is certainly evidence Donelson used his foot in a way likely to produce death or serious bodily injury. But because Donel-son was charged with injuring Crosby “with a deadly weapon,” we focus our analysis on whether tíie evidence supports that Donelson injured Crosby with a deadly weapon.

. See, e.g., Grayson v. State, 879 So.2d 1008, 1020 (¶ 32) (Miss.2004) (citation omitted) ("[I]t is presumed the jurors follow the instructions of the court.”).

. See, e.g., Evans v. State, 25 So.3d 1054, 1057 (¶ 6) (Miss.2010).

. Donelson's three-paragraph proposed instruction read:
The testimony of a witness may be discredited by showing that the witness testified *1165 falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial. Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.
If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves. I remind you that a defendant has the right not to testify. When the defendant does testify, however, his testimony should be weighed and his credibility evaluated in the same way as that of any other witness.

. Since Ellis, the supreme court has clarified that an accomplice's testimony simply has to be uncorroborated in order to get a cautionary instruction. Williams, 32 So.3d at 491 (¶ 17).